# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JAMAL O. MARTIN, dob 1976,<br>TABARES P. SPENCER, dob 1979,<br>DWAYNE L. TOLIVER, dob 1976,<br>RUDOLPH WESSON, dob 1960, | **CRIMINAL COMPLAINT**<br><br>CASE NUMBER: 07-53m (AEG) |

    I, Jill Ceren, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning approximately in April 2005, and continuing to on or about September 8, 2006, in Milwaukee, in the State and Eastern District of Wisconsin, the above-named individuals did knowingly and intentionally conspire to distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, §§ 841 & 846.

    I further state that I am a Special Agent with the U.S. Drug Enforcement Administration, and that this complaint is based on the facts contained in the attached affidavit.

Continued on the attached sheet and made a part hereof: ✔ Yes

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 16, 2007            at    Milwaukee, Wisconsin
Date                                                                  City and State

Aaron E. Goodstein, U.S. Magistrate Judge       _____
Name & Title of Judicial Officer                                Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jill Ceren, being first duly sworn on oath, state that:

## I. PURPOSE AND BACKGROUND

1. I am a special agent for the United States Department of Justice Drug Enforcement Administration, working in the Milwaukee, Wisconsin District Office. I have been employed as a DEA agent for over 16 years. In the course of my work, I investigate violations of federal drug trafficking laws. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2. The information contained in this affidavit is based upon my personal observations and investigation, information relayed to me by other law enforcement agents and officers, and through official law enforcement reports. To the extent that the information is not based upon my personal knowledge, I believe it to be truthful and reliable. It is also based upon information gained from interviews with a cooperating informant, whose reliability is established separately herein.

3. During the course of my employment, I have participated in at least 100 investigations involving the distribution of controlled substances, During my tenure with DEA, I have authored over 50 affidavits supporting wire and electronic intercepts, criminal complaints, search and seizure warrants. I have debriefed more than 100 defendants, informants, and witnesses who have personal knowledge regarding major narcotics trafficking organizations and activities. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving large amounts of cocaine, cocaine base (crack cocaine), marijuana, and/or other controlled substances, I know and have observed the following:

    A. I have utilized informants to investigate drug trafficking. Through informant

interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances;

B. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances myself;

C. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking activities. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

D. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

E. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

F. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms and ammunition, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons, as well as records or receipts pertaining to firearms and ammunition;

G. I have been the case agent during court-authorized interceptions of communications, have applied for and received permission to intercept wire communications, and have experience operating the equipment utilized to conduct such operations;

H. I know that drug dealers often put telephones in the name of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

I. I know that large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

J. I know that large-scale drug traffickers must maintain on-hand, large amounts of US currency in order to maintain and finance their ongoing drug business;

K. I know that it is common for drug traffickers to maintain books, records, receipts,

notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

L.  I know that it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the trafficker within their residences, businesses or other locations over which they maintain dominion and control;

M.  I know that large-scale drug traffickers often use electronic equipment such as telephone (land lines and cellular phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

N.  I know that when drug traffickers amass large proceeds from the sale of drugs, that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorney and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

O.  I know that the sale of cocaine, crack, marijuana, and other controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

P.  I know that it is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for the drugs thereby leaving residue traces of drugs on the "street money". That law enforcement agencies own dogs which are trained to react to the scent of drugs and residue traces of drugs; and that those trained dogs have reacted to drug-tainted currency negotiated at banks and concealed in drug traffickers' homes;

Q.  I know that it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

R.  I know that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed, may establish probable cause that there is a substantial connection between the

questionable currency and drug transactions;

S.  I know that the Currency Transaction Report (CTR) (Internal Revenue Service Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

T.  I know that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no single transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

U.  I know that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year in which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their home and businesses;

V.  I know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

W.  I know that cocaine, crack, and marijuana traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

X.  I know that drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their drugs. That these traffickers usually maintain these photographs in their possession.

4.  This affidavit is based on my personal investigation and knowledge as well as information reported to me by other federal, state, and local law enforcement officers (case agents) during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gained from interviews with citizen witnesses, informants, and defendants, whose reliability is establishes separately herein. I also base this affidavit on evidentiary items seized during the course of this investigation, as described below.

5. This affidavit is submitted in support of an application for criminal complaints, arrest warrants, and search warrant for violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and 846, conspiracy to distribute 100 kilograms of more of marijuana for the target individuals listed below and locations associated with the target individuals.

## II. INDIVIDUALS FOR WHOM A CRIMINAL COMPLAINT IS SOUGHT

6. The target individuals are more particularly identified as:

   a. Jamal O. MARTIN (DOB: 03-22-1976)

   b. Tabares P. SPENCER (DOB: 05-26-1979)

   c. Dwayne L. TOLIVER (DOB: 08-05-1976)

   d. Rudolph WESSON (DOB: 09-05-1960)

As detailed below, there is probable cause to believe the above-listed individuals have committed violations of federal drug offenses, including violations of Title 21, USC 841 and 846, conspiracy to distribute in excess of 100 kilograms of marijuana.

## III. LOCATIONS FOR WHICH SEARCH WARRANT IS SOUGHT

7. As detailed below, there is probable cause to believe that located at the below-described premises are items that constitute evidence of the commission of drug trafficking, including violations of Title 21, USC, Sections 841 and 846. Such items are detailed in Attachment A - Items to be Seized.

   a. 2850 N 56th Street, Milwaukee, WI (residence of MARTIN), more particularly described as two story single family residence, tan siding, brown trim, with detached garage, with the number 2850 in black affixed to the west side of the building to the left of the front door;

   b. 4213 N 13th Street, Milwaukee, WI (residence of SPENCER), more particularly described as two story single family residence with tan

siding, brown trim, red roof, with the numbers 4213 in black affixed to the pillar to the left of the white front door which faces east;

c. 2571 N 55th Street, Milwaukee, WI (business of TOLIVER), more particularly described as a one story cinder block building with tan and pink siding, with number 2571 in black affixed to the left of the glass front door which faces north;

d. 3121 S 42nd Street, Milwaukee, WI (residence of TOLIVER), more particularly described as a two story single family residence with brown brick siding, brown roof, with number 3121 in black affixed to the left of the brown front door which faces east;

e. 9619 W Allyn Street #8, Milwaukee, WI (residence of WESSON), more particularly described as two story multi family dwelling, with tan siding and red brick siding, dark brown trim, with the number 9619 in white affixed above the brown front door which faces north.

## IV. PROBABLE CAUSE

8. On September 7, 2006, police officers in Omaha, Nebraska, conducted a traffic stop on I-80 on a 2001 Chevy Tahoe driven by Juan Briones. A consent search of the vehicle revealed approximately 900 pounds of marijuana concealed in bags throughout the interior of the vehicle. Briones made a post-arrest Mirandized statement to the police, stating this was his third trip to the Milwaukee, WI area in 2006 to transport marijuana for Jorge Gonzalez Aguayo. The first trip was in January 2006 when Briones transported 400 pounds of marijuana and received $3,000 in payment. The second trip was in May 2006 when Briones transported 500 pounds of marijuana and received $3,500 in payment. I know that 1,800 pounds of marijuana is the equivalent of 816 kilograms.

9. Briones further stated that once he arrived in Milwaukee, he was instructed to check into the Holiday Express on 13th Street and College Avenue in Milwaukee, where he was to meet Gonzalez and give him the keys for the Chevy Tahoe. Briones stated Gonzalez was flying out of Denver, CO, and after arriving in Milwaukee, would drive the Tahoe to a storage facility with an

-6-

unknown black male (later identified as Reginald Bickham) while Briones waited for Gonzalez to return to the hotel to make payment to Briones. After Gonzalez paid Briones, Gonzalez would drive the vehicle with the money back to an unknown location.

10. On September 8, 2006, case agents observed Gonzalez board a Frontier flight in Denver bound for Milwaukee, and later arrive in Milwaukee. At approximately 3:58 pm, case agents observed Reginald Bickham pick up Gonzalez at the Milwaukee airport in a gray 2003 Hummer registered to Lacey Raynor at 361 W Swan Circle, Unit 3003, Oak Creek, WI.

11. Case agents followed the Hummer to 361 W Swan Circle where it parked briefly in the vicinity of Unit 3003, and later followed the Hummer to the Holiday Inn Express where Briones, under the direction and control of case agents, was checked in. Investigating agents parked the Tahoe, loaded with marijuana, at the Holiday Inn Express and gave the keys to Briones. After Gonzalez was dropped off at the hotel, he made contact with Briones, who provided him with the Tahoe keys.

12. Later that evening, Gonzalez left the hotel in the Tahoe and drove to 361 W Swan Circle, Oak Creek, and parked in the garage of Unit 3003. Case agents then arrested Reginald Bickham inside unit 3003 and Gonzalez, who was still in the garage with the Tahoe. Also located inside the residence was Lacey Raynor, Bickham's girlfriend who lives at the residence with Bickham.

13. Gonzalez provided a proffer statement to agent subsequent to his arrest. Gonzalez stated the black man who picked him up at the airport in Milwaukee earlier in the day is the person residing at Unit 3003 (Bickham). Gonzalez stated he had been delivering shipments of marijuana from Denver to Bickham since April or May 2006. Gonzales stated prior to delivering marijuana

-7-

Case 2:07-mj-00053-AEG   Filed 05/16/07   Page 8 of 15   Document 1

in Milwaukee, Gonzalez received currency from marijuana sales from Bickham starting around January 2006. Gonzalez estimated he made at least ten currency deliveries from Milwaukee to Denver, in amounts ranging from $50,000 to $200,000. Gonzalez stated he has made about five marijuana deliveries to Bickham, all originating in Denver, and that he began accompanying Bickham's previous source of supply on marijuana deliveries to Bickham, and oversaw currency deliveries from Bickham back to Denver. Gonzalez stated he oversaw marijuana deliveries to Bickham ranging in weights from 250 to 500 pounds, and the 900 pound delivery was Gonzalez' largest to date. Gonzalez stated Bickham was currently up to date with payments for the marijuana Gonzalez delivered to Bickham. Gonzalez stated that at the time of his arrest, Bickham was holding 130 pounds of low-quality marijuana which Gonzalez had previously delivered to Bickham, and Bickham refused to pay for. Gonzalez stated he was in the process of arranging to pick up the low-quality marijuana and re-deliver it to another customer of the Denver source.

14. On September 9, 2006, a federal search warrant was executed at Bickham's residence. Approximately $11,000 in currency, a loaded 9 mm handgun and ammunition, 50 pound scale, three vehicles, cellular telephones, and numerous documents including dated and undated drug ledgers were seized from the residence. State search warrants were executed at four storage units rented by Bickham in Racine County, WI, and a vehicle and approximately 130 pounds of marijuana were seized from the storage units.

15. Bickham made a proffer statement to case agents following his arrest. He disclosed the location of approximately $593,000 in marijuana sale proceeds and a money counter to agents. Bickham stated he was holding the money to purchase the 900 pounds of marijuana being delivered by Gonzalez on September 8, 2006. Bickham stated he had collected the drug proceeds from various

-8-

marijuana distributors in Milwaukee, WI. Bickham stated that the drug ledgers seized by agents from his residence reflected currency pickups and marijuana deliveries to Bickham's distributors. Bickham utilized nicknames in the drug notes, as noted below. In addition, Bickham identified various residences and telephone numbers associated with his distributors.

16. Reginald Bickham identified Jamal MARTIN as a marijuana customer of Bickham's. Bickham identified a photograph of MARTIN and stated MARTIN is listed as JT in Bickham's drug ledgers. Bickham stated MARTIN lives at 2850 N. 56th Street, Milwaukee, WI and utilized telephone numbers 414-839-5068 and old number 414-793-9133 (These numbers were in Bickham's telephone directories.) Bickham's dated and undated drug ledgers indicate that MARTIN received 185 pounds of marijuana from Bickham, and paid $185,505 in drug proceeds to Bickham. The dated ledgers indicate that MARTIN received marijuana and paid Bickham drug proceeds at least four times between May through September 2006. Bickham indicated that undated ledgers pertained to his marijuana trafficking prior to May 2006.

17. Bickham stated that a portion of the approximately 900 pounds of marijuana seized from Bickham's residence on September 8, 2006, was destined for MARTIN. Bickham stated he normally charged MARTIN $650 per pound. Any variations in the price were noted in the drug ledgers, according to Bickham. (Notes showing $700 per pound was charged for 35 pounds supplied by Bickham to MARTIN were located in the drug ledgers of Bickham.) Bickham stated that a portion of the approximately $600,000 seized from Bickham was money he collected from MARTIN.

18. An analysis of Bickham's phone tolls shows more than 30 calls made to Bickham by MARTIN in the period August 22 through October 4, 2006. (It should be noted Bickham acquired

-9-

this phone on August 22, 2006.) A previous phone carried by Bickham shows 15 calls between Bickham and MARTIN between January and June 2006. A May 14, 2007, check of utilities showed that Jamal O. MARTIN has been the subscriber of utilities at 2850 N. 56th Street since October 2003.

19. Bickham stated that he never dealt with MARTIN on the street and that all of their drug activities occurred at MARTIN's residence, 2850 N. 56th St. Bickham's statement, telephone records for Bickham and MARTIN, and Bickham's drug ledgers all indicate that Bickham was dealing with MARTIN in January 2006, through early September 2006. He further stated that on between 10 and 15 occasions, he drove into the garage of MARTIN's residence located at 2850 N 56th Street, Milwaukee, WI, in order to drop off marijuana to MARTIN. Bickham further stated he also picked up drug proceeds from MARTIN at MARTIN's residence on multiple occasions, the last of which was early September 2006 (drug notes indicate the last money pick-up was September 3, 2006), prior to being arrested on September 8, 2006.

20. According to the proffer statement of Reginald Bickham, Tabares SPENCER is a marijuana customer of Bickham. Bickham identified a photograph of SPENCER, and stated that SPENCER is listed as PW or PeeWee in Bickham's drug ledgers. Bickham stated SPENCER lives at 4213 N. 13th Street, Milwaukee, WI, his mother's residence, and used phone numbers 414-305-1187 and 414-241-2192. The dated and undated drug ledgers of Bickham indicate that SPENCER received 144 pounds of marijuana and paid $140,260 in drug proceeds to Bickham. The dated ledgers indicate SPENCER paid drug proceeds two times to Bickham in June and July 2006. Bickham stated SPENCER paid $650 per pound for marijuana, unless noted otherwise in Bickham's drug ledgers. The drug ledgers indicate that SPENCER paid $700 per pound for 35 pounds of

Bickham's marijuana. Bickham indicated that undated ledgers pertained to his marijuana trafficking prior to May 2006.

21. A February 2007 check of indices shows that SPENCER's driver license lists to 4213 N. 13th Street. A May 14, 2007, utility check shows that Mary Spencer is the owner of 4213 N. 13th St. Public records indicate that Mary Spencer is a relative of Tabares SPENCER. A total of 10 calls were placed between SPENCER's two numbers and Bickham's phone between August 22, 2006, and September 2006. (Bickham acquired this phone on August 22nd.) A review of records from Bickham's old phone shows more than 30 calls between SPENCER and Bickham from January to July 2006.

22. Bickham stated that a portion of the marijuana seized from Bickham's residence on September 8, 2006, was destined for SPENCER. Bickham stated that a portion of the approximately $600,000 seized from Bickham was money he collected from SPENCER. Bickham stated he picked up drug proceeds from SPENCER at SPENCER's residence, 4213 N. 13th St, on September 8, 2006, the day Bickham was arrested. Bickham further stated he has dropped off marijuana at SPENCER's residence on at least ten occasions between January 2006 and August 2006.

23. Reginald Bickham stated in a proffer statement that Dwayne TOLIVER is a marijuana customer of Bickham. Bickham identified a photograph of TOLIVER, and stated that TOLIVER is listed as Big Baby or Wash in Bickham's drug ledgers. Bickham stated TOLIVER uses telephone number 414-322-0438 (located in Bickham's phone directory, also located in the phone directory of Rahjee SHABAZZ) and works at or operates the Keep It Clean Car Wash located at 2571 N 55th Street, Milwaukee, WI. The Keep It Clean Car Wash lists contact telephone number 414-322-0438 on a business sign. A check of indices on May 14, 2007, showed that TOLIVER is the listed utility

-11-

subscriber at 2571 N 55th Street.

24. The undated drug ledgers of Bickham indicate that TOLIVER received 390 pounds of marijuana and paid $127,925 in drug proceeds to Bickham. The undated ledgers pertain to dates prior to May 2006, according to Bickham.

25. Bickham stated that TOLIVER's business, the car wash located at 2571 N 55th Street, was the site on multiple occasions for the offloading and distribution of marijuana between April 2005 and February 2006. Bickham stated that on at least 10 occasions, Bickham met his Mexican source of supply at TOLIVER's car wash in order to offload hundreds of pounds of marijuana. Bickham stated TOLIVER had the keys to the car wash, and unlocked and locked the doors of the car wash so they could offload the marijuana out of sight. Bickham stated that between five and 10 times, he distributed 30 to 50 pound loads to TOLIVER at the car wash. Bickham stated that between five and 10 times, he distributed 50 to 100 pound quantities of marijuana to Rudy WESSON at TOLIVER's car wash. The last of the marijuana deliveries and money pick-up at 2571 N 55th Street occurred sometime in February 2006.

26. Bickham stated he broke off the relationship with TOLIVER in early 2006 after TOLIVER did not pay for 14 pounds of marijuana Bickham fronted TOLIVER. Bickham's phone tolls (from January 1, 2006 forward) show more than 175 calls between TOLIVER and Bickham from January 5 and February 28, 2006.

27. A check of indices on May 14, 2007, showed that TOLIVER is listed as the owner and utility subscriber of 3121 S 42nd Street, Milwaukee, WI. Utilities were established at this residence in May 2006. TOLIVER has a felony conviction for possession with intent to distribute cocaine.

28. Rahjee Shabazz, a co-conspirator in this investigation, provided a proffer statement to agents subsequent to his arrest in January 2007. Shabazz stated that he was assisting Bickham with marijuana deliveries for several months in 2005 prior to Shabazz's arrest in June 2005. Shabazz was arrested with approximately 50 pounds of marijuana that he had received from Bickham. Shabazz stated he was with Bickham when Bickham received about five loads (hundreds of pounds) of marijuana from a Denver-based source of supply at TOLIVER's car wash. Shabazz stated that TOLIVER and, and at times WESSON, were present during the deliveries at the car wash. Shabazz further stated that TOLIVER and WESSON subsequently received hundreds of pounds of marijuana through Bickham that had been delivered to the car wash. Shabazz identified photographs of Rudolph WESSON and Dwayne TOLIVER as customers of Bickham who received hundred-pound quantities of marijuana from Bickham at the car wash. Shabazz stated TOLIVER owns and operates the car wash.

29. Reginald Bickham stated in a proffer statement that Rudolph WESSON is a marijuana customer of Bickham. Bickham identified a photograph of WESSON, and stated that WESSON is listed as RU or RUDY in Bickham's drug ledgers. Bickham stated WESSON uses phone number 414-349-6273, 414-899-5225, and 414-234-0084 (from Bickham's phone directory). The dated and undated drug ledgers of Bickham indicate that WESSON received 1,170 pounds of marijuana and paid $884,865 in drug proceeds to Bickham. The dated ledgers show WESSON paid drug proceeds to Bickham from May through September 2006 in amounts ranging from $8,880 to $102,934.

30. Bickham stated that a portion of the marijuana seized from Bickham's residence on September 8 was destined for WESSON, and that Bickham normally charged WESSON $650 per pound, unless noted otherwise in his drug notes. The drug ledgers show that for 170 pounds of

-13-

marijuana, Bickham charged WESSON $700 per pound. Bickham stated that a portion of the approximately $600,000 seized from Bickham was money he collected from WESSON. Bickham's phone tolls show more than 85 calls between WESSON and Bickham between August 22 and September 9, 2006. (The phone service on Bickham's phone started on August 22, 2006). A May 14, 2007, check of utilities showed that WESSON has been listed as the utility subscriber at 9619 W. Allyn St #8, Milwaukee, WI, since August 2006 with telephone number 414-349-6273. Phone number 414-349-6273 has been subscribed to Rudy WESSON since 2001.

31. WESSON has a federal felony conviction for conspiracy to distribute cocaine in 1988.

## V. CONCLUSIONS

32. Based on the foregoing, I believe there is probable cause to believe that the individuals identified in paragraph 6 above have committed violations of federal drug trafficking offenses, including violations of Title 21, USC, Sections 841 and 846. More specifically, I believe there is probable cause to believe that beginning sometime in April 2005 and continuing until on or about September 8, 2006, in the Eastern District of Wisconsin, the individuals identified in paragraph 6 above have knowingly and intentionally conspired to possess with the intent to distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of title 21, USC Sections 846, 841(a)(1) and 841(b)(1)(B).

33. Furthermore, based on the foregoing, I believe there is probable cause to believe that located in the locations described in paragraph 7 above there is evidence of drug trafficking and fruits, instrumentalities, and proceeds of drug trafficking, all of which is detailed more specifically in Attachment A, Items to be Seized.